9432/JMT
CICHANOWICZ, CALLAN, KEANE, VENGROW & TEXTOR, LLP
61 Broadway, Suite 3000
New York, New York 10006-2802
(212)344-7042
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
AUG – 5 2009
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| K/S ERRIA IDA, | |
| Plaintiff, | 09 Civ. __6915__ |
| - against - | |
| STANDARD COMMODITIES AUSTRALIA PTY LTD. | VERIFIED COMPLAINT IN ADMIRALTY |
| Defendant. | |

Plaintiff, by its attorneys, Cichanowicz Callan Keane Vengrow & Textor, LLP, for its complaint, alleges on information and belief:

1.    The jurisdiction of this Court is based upon the admiralty and maritime nature of the claims within the meaning of 28 U.S.C. 1333(1) and F.R.Civ.P. 9(h).

2.    Plaintiff is a Denmark corporation with its principal place of business in Denmark.

3.    Defendant is a foreign entity organized and existing under the laws of a foreign country.

4.    On March 3, 2009 plaintiff, as "owner" of the motor vessel M/T YM JUPITER (hereinafter, the "vessel"), entered into a tanker voyage charter party (hereinafter, "charter party") with defendant Standard Commodities Australia PTY LTD. (hereinafter "SCA") as

charterer for a voyage from Barcelona/Genoa to Port Harcourt/Lagos. A copy of the charter party is attached hereto as Exh A.

5.      Pursuant to the charter party, defendant SCA is liable for demurrage at a rate of $14,000 per day pro rata.

6.      Under the charter party a demurrage liability totaling $372,840.05 was incurred by defendant SCA. Attached hereto as Exh. B is a copy of plaintiff's demurrage calculation to defendant SCA in that amount.

7.      SCA has paid $266,000.00 of the demurrage, leaving a balance of $106,840.05 unpaid.

8.      Despite demands for payment, defendant SCA has not paid the remaining balance of the demurrage.

9.      Defendant SCA's failure to pay the said demurrage constitutes a breach of the charter party.

10.      The charter party provides for New York arbitration, and plaintiff intends to commence arbitration against defendant SCA to recover $106,840.05 plus interest and costs, and security is hereby sought in the instant action as follows:

| | | |
|---|---|---|
| A. | Principal amount of the above claim: | $106,840.05 |
| B. | Estimated allowance for interest at 6% p.a. for 2 years: | $12,820.81 |
| C. | Estimated costs and fees of Arbitration: | $100,000.00 |
| | Total: | **$219,660.86** |

11.      This action seeks security in aid of the said arbitration pursuant to 9 U.S.C. 1 and 8.

2

12.     Defendant SCA cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

13.     Upon information and belief, defendant SCA or will have during the pendency of this action, assets within this district, including but not limited to, electronic fund transfers, and subject to the jurisdiction of this Court including, but not limited to, assets held in the hands of garnishees.

14.     Plaintiff seeks an order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Admiralty Rules attaching, inter alia, any assets including electronic funds transfers of Shipping Land held by any garnishee in the district for purpose of obtaining personal jurisdiction over defendant and to secure its claim.

15.     There is no statutory or maritime bar to the attachment sought herein.

WHEREFORE, Plaintiff prays:

(a)     That process in due form of law according to the practice of this Court in cases of admiralty and maritime jurisdiction issue against the defendants, citing them to appear and answer under oath all and singular the matters alleged;

(b)     That since the defendant cannot be found within the district pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules and the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all tangible or intangible property of defendant in whatever form or any other funds held by any garnishees to be named in the process up to the amount of

3

$219,660.86 which represents plaintiff's good faith estimate of the principal amount, prejudgment interest, costs and disbursements sued for to secure the plaintiff's claim, and that all persons claming any interest in the same be cited to appear and, pursuant to Supplemental Admiralty Rule B, answer the matters alleged;

      (c)    That plaintiff has judgment for the amount of its claim together with interest plus the costs and disbursements of this action.

Dated: New York, New York
      August 5, 2009

                        CICHANOWICZ, CALLAN, KEANE,
                        VENGROW & TEXTOR, LLP
                        Attorneys for Plaintiff

                        By: _____
                              Randolph H. Donatelli
                        61 Broadway, Suite 3000
                        New York, New York 10006-2802
                        (212) 344-7042

## ATTORNEY VERIFICATION

The undersigned declares that the following statement is true under the penalties of perjury:

1.    I am over 18 years of age, of sound mind, capable of making this verification and fully competent to testify to all matters stated herein.

2.    I am attorney for the plaintiff in this action and I am fully authorized to make this verification on its behalf.

3.    I have read the foregoing complaint, and the contents thereof are true and accurate to the best of my knowledge upon information and belief.

4.    The reason that this verification was made by me and not the plaintiff is that the plaintiff is an alien corporation, none of whose officers are present in the district.

5.    The source of my knowledge is information and records furnished to me by plaintiff all of which I believe to be true and accurate.

Dated: New York, New York
　　　 August 5, 2009

_____
Randolph H. Donatelli

# EXHIBIT A

Association of Ship Brokers
& Agents (U.S.A.), Inc.
October 1977



**SAFE HARBOUR**
**Tanker Chartering LLC**
162 Monroe Turnpike △ Monroe, CT 06468

CODE WORD FOR THIS
CHARTER PARTY:
ASBATANKVOY
1 of 4

TANKER VOYAGE CHARTER PARTY

PREAMBLE

New York, NY   March 3, 2009
Place        Date

IT IS THIS DAY AGREED between   K/S Erria Ida, Denmark

chartered owner/owner (hereinafter called the "Owner") of the   Maltese

M/T YM Jupiter Owners Option Substitute   (hereinafter called the "Vessel")

and   Standard Commodities Australia PTY LTD   (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble

and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

PART I

Built:   2007
LOA:    148.00 Meters
Beam:   21.60 Meters

A.   Description and Position of Vessel:

Deadweight:  15,996.5 Metric tons (2240 lbs.)    Classed: Bureau Veritas

Loaded draft of Vessel on assigned summer freeboard  8.6 Meters in salt water.

Capacity for cargo:              tons (of 2240 lbs. each)       % more or less, Vessel's option.

Coated:   ☐ Yes    ☐ No

Colled:   ☐ Yes    ☐ No         Last two cargoes:

Now:           Expected Ready:

B.   Laydays:
     Commencing:  March 20, 2009              Cancelling:  March 23, 2009

C.   Loading Port(s):
     One (1) Safe berth / One (1) Safe port Barcelona and/or One (1) Safe berth Genoa – where no low flash in transit.
     Genoa in direct continuation.
                                                           Charterer's Option

D.   Discharging Port(s):
     One (1) Safe berth / One (1) Safe port Port Harcourt and One (1) Safe berth / One (1) Safe port Lagos.
     First discharge port to be Port Harcourt where 7.8 meter draft local density.
                                                           Charterer's Option

E.   Cargo:  Ten Thousand (10,000) Metric Tons two (2) – four (4) grades Tallow Two (2) percent MOLCO.

                                                           Charterer's Option

F.   Freight Rate:  U.S. Dollars 65.00 Per Metric Tons basis 2-2

G.   Freight Payable to:   Owner's Designated Account in U.S Dollars

H.   Total Laytime in Running Hour  100 MT per Hour for Loading/75 MT per Hour for Discharging; REVERSIBLE SHINC

Safe Harbour Tanker Chartering LLC

I.      Demurrage per day: U.S. Dollars 14,000 Per Day Pro Rata.

J.      Commission of  ---- % payable by Owner to  ----------See Special Provisions

        on the actual amount of freight, when and as freight is paid.

K.      The place of General Average and arbitration proceedings to be London/New York (strike out one) under English/U.S. law.

L.      I.T.O.P.F.: Owner warrants vessel to be a member of I.T.O.P.F. scheme and will be so maintained throughout duration of this charter.

M.      Special Provisions:

   1.   Last three (3) cargoes: Clean and Unleaded. First last cargo not to be on the Fosfa Banned List.

   2.   Owners warrant full segregation of the products during loading, sailing and discharge and will provide separate tanks, lines and pumps for Charterer's cargo.

   3.   Freight payable by no later than 5 days after sailing load port and always before breaking bulk.

   4.   Commission: 2.5 percent Safe Harbour Tanker Chartering, LLC on all moneys earned.

   5.   Place of GA/Arbitration: New York / U.S. Law.

   6.   If required bills of lading to be marked "clean on board" and same to be signed by owners accordingly. "Clean" in this context refers to the condition of the documentation i.e. a clean bill of lading without clauses or blemishes or exceptions upon it. "Clean" in this context does not refer to the quality/quantity or condition of the commodity. If Charterers require "freight prepaid b/ls", then same only to be released by owners against a faxed copy of the swift transfer document.

   7.   War risk premium: Extra War Risk Insurance Clause: All war risk insurance premiums applicable on date of this charter party are included in the freight rate.

        Chevtex war risk clause to apply: An increase of hull and machinery war risk premiums over and above those in effect on the date of this c/p, will be for charterer's account. Any premiums, or increases thereto, attributable to closure (i.e. blocking and trapping) insurance shall be for owners' account. Surcharges which are in effect on the date of this c/p are for owners' account.
        Owners to advise additional War Risk premium for the nominated vessel.

   8.   Owners usual protection clauses as attached to be applied, except:
        Clause 3: delete all.
        Clause 4: delete all.

   9.   Heating as per Charterers attached clauses.

   10.  Standard Commodities Rider Clauses as agreed and amended, as per attached Clauses #1-36 (which are terms from YM Jupiter/Standard Commodities CP October 5, 2007 charter party) plus ISPS Clauses, to be incorporated in this Charter Party. Where in conflict the rider terms override Part II of Asbatankvoy cp.

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness the signature of :

                                        By:  _____

Witness the signature of:

                                        By:  _____

## PART II

**1. WARRANTY—VOYAGE—CARGO.** The Vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pumps, heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

**2. FREIGHT.** Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except Deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

**3. DEADFREIGHT.** Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

**4. NAMING LOADING AND DISCHARGE PORTS.**

(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for orders:

*On a voyage to a port or ports in:*

| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
| | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere). |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

**5. LAYDAYS.** Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

**6. NOTICE OF READINESS.** Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a loading or discharging terminal and all fast when loading or discharging alongside a wharf, whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

**7. HOURS FOR LOADING AND DISCHARGING.** The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

**8. DEMURRAGE.** Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilot.

**9. SAFE BERTHING—SHIFTING.** The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival and leaving dock, wharfage and other expenses, and any extra expense incurred in shifting Vessel but shall not be liable for any demurrage for detention whilst awaiting seaworthy lost incurred in connection with shifting, Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

**10. PUMPING IN AND OUT.** The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipes of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, or should the Charterer or consignee supply electric power for discharging, the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into the Vessel, if required by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

**11. HOSES: MOORING AT SEA TERMINALS.** Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine lines.

**12. DUES—TAXES—WHARFAGE.** The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at La Havre and Portuguese Imposto de Comercio Maritimo. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French dues de quai and Spanish derecho de obras. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

**13. (a). CARGOES EXCLUDED VAPOR PRESSURE.** Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b). **FLASH POINT.** Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

(c). **ICE.** In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is directed for reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

**14. TWO OR MORE PORTS COUNTING AS ONE.** To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d). Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

**15. GENERAL CARGO.** The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

**16. QUARANTINE.** Should the Vessel be ordered to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

**17. FUMIGATION.** If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not clear of stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

**18. CLEANING.** The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

**19. GENERAL EXCEPTIONS CLAUSE.** The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:—any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from:—Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

**20. ISSUANCE AND TERMS OF BILLS OF LADING**

(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Bill of Lading called the "carrier" shall include the Owner and the Charterer/Owner of the Vessel.

(i) **CLAUSE PARAMOUNT.** This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

Standard Commodity Clauses

The below listed clauses to apply independently and held separate

**1. YORK / ANTWERP CLAUSE**
General Average shall be adjusted and settled according to York / Antwerp Rules 1994.

**2. GENERAL AVERAGE / ARBITRATION**
General Average/Arbitration in New York, U.S. Law to apply.

**3. CONDITIONS OF CARRIAGE**
Carriage of cargo under this Charter Party/Contract shall be in accordance with the terms and conditions of Part II of Asbatankvoy Charter Party. In the event of any conflict between this Charter Party/Contract and Part II of the attached form of voyage Charter Party, the terms and conditions of this Charter Party/Contract shall prevail. The Owner warrants that, during the term of this Charter Party/Contract, the vessel is fully classed to carry the said cargoes and complies with all local, state, national, and international rules and regulations relevant to the said cargoes and trade set forth in this Charter Party/Contract and possesses current certificates/documentation required for the intended trade/cargoes. This includes but is not limited to: IMO, Marpol, U.S. Coast Guard and OPA '90.

**4. ITOPFL**
Owners warrant that they are a member of the International Tanker Owners Protection Federation Limited ("ITOPFL") and will remain so during the period of this Charter Party/Contract.

**5. ISM CLAUSE**
Owners to confirm that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirements of the ISM Code and have obtained all required governmental permits or certificates of compliance required by the ISM Code, enabling the vessel to enter, load, discharge and depart from ports under this Charter Party/Contract. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterer.    Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners, vessel or 'the Company' to comply with the ISM Code shall be for the Owner's account.

**6. DRUG AND ALCOHOL POLICY**
The Owner warrants that it has in place a policy that meets or exceeds the requirements for the "Guidelines for the Control of Drugs and Alcohol aboard Ships" issued by the Oil Companies International Marine Forum, (OCIMF).

**7. PRIVATE AND CONFIDENTIAL CLAUSE**
Terms and conditions of this fixture to be kept private and confidential

**8. COMPETITIVE TALLOW CLAUSE**
Vessel to have no other Tallow onboard without the Charterer's approval.

**9. COMPLETION ROTATION**
The Owner shall have the option of loading other cargo at same or other loading port(s) for discharge at same or other discharge port(s) for own or other account. The vessel's rotation of loading and discharging is at Owner's option, to be geographical.

**10. SEGREGATION**
The Owner agrees to keep Charterer's cargo(es) completely segregated from all other cargo onboard the vessel. The vessel shall use separate tanks, pumps and pipes for each of Charterer's grades of cargo.

**11. CLEANING / INSPECTION**

a.   It is agreed that Clause 18, Part II of Asbatankvoy is deleted, except for the first sentence: "the Owner shall clean tanks, pipes and pumps of the vessel to the satisfaction of the Charterer's inspector".

b.   Cleaning at load berth is not permitted and the Owner agrees to vacate the berth while cleaning the vessel.

c.   If on presentation for loading, the Charterer's inspector rejects the vessel due to insufficient cleanliness, Owner shall perform further cleaning in accordance with any reasonable recommendation of Charterer's inspector. Should the vessel's tanks, pipes and pumps not be clean to the satisfaction of Charterer's inspector after further cleaning, the Charterer shall have the right either cancel the particular shipment or reach mutual agreement with Owner either postponing the shipment to the next available sailing or discuss additional cleaning, or stowage options.

d.   Should the vessel fail the inspection procedure as described in section C, the Owner shall be required to pay for the cost of any subsequent inspections by the Charterer's inspector at the load berth/port.

e.   The acceptance of the vessel by Charterer's inspector shall not limit the liability the Owner might otherwise have for the cargo being contaminated by the vessel.

12.   RECEIVING / PUMPING OUT

Owner warrants vessel is capable of receiving/discharging her cargo at a rate of at least 125 metric tons per hour, per grade, or maintaining 100 PSI at ships rail (during discharge operations), providing shore facilities are capable of receiving same. If the vessel fails to maintain the foregoing rate while pumping, the difference in time between this rate and the actual time at a lower rate will be added to allowed laytime or if the vessel fails to maintain the foregoing pressure, the actual time pumping at a lower pressure will be added to the allowed laytime.

13.   VESSEL SUBSTITUTION

If the Owner substitutes the nominated vessel, the substitute vessel shall be of similar characteristics, age and laydays as the original vessel. The Owner shall promptly notify the Charterer of such substitution. Any substitution shall be subject to Charterer's approval, which shall not be unreasonably withheld.

14.   OPA / COFR

i).   Owner warrants that during the period of this Charter Party/Contract of Affreightment they will provide the vessel with the following certificates provided same are obtainable:

a.   Certificates issued pursuant to the Civil Liability Convention 1969 (C.L.C) as amended by any applicable protocol thereto.

b.   Certificates issued pursuant to section 311 (P) of the U.S. Federal Water Pollution Control Act as amended [title 33 U.S. Code Section 1321 (P)]:

c.   Certificate of Financial Responsibility pursuant to the Oil Pollution Act of 1990 (OPA), but limited to the requirements set forth in the interim or final rule on COFR's dated July 1, 1994.

ii).   If certificates in excess of those described in paragraph 1 (additional certification) are required for the vessel lawfully to trade to or within any state or territory in the performance of this Charter Party/Contract and if additional certification is available on the payment only of additional premiums, surcharges or other payments and without other requirements, Owner will procure the certification at Charterer's expense. Charterer will be notified of cost of such certification and will have the option to pay such cost or within thirty (30) days have the right to cancel the contract.

iii).   If, after the date of this Charter Party/Contract of Affreightment, laws or regulations issued by any state or territory within the trading limits set forth in this Charter Party/Contract of Affreightment were to require Owner to make any changes or additions to the vessel, it's equipment, it's crew and it's manner of operating the Owner will notify the Charterer of such requirements and it's estimated costs. Within thirty (30) days Charterer will notify Owner in writing if it will pay the costs of compliance. If Charterer agrees to pay, Charterer shall pay to Owner the costs incurred by Owner in complying with the requirement on demand and Owner shall then effect any necessary changes or additions at a time to be agreed. If Charterer does not agree (or fails to respond in a timely manner to Owner's notice), Owner shall be under no obligation to effect that requirement and the vessel shall be under no obligation to proceed to the state or territory in question.

2

## 15. ITF CLAUSE
Owner warrants that the vessel fully complies with all ITF requirements and that the vessel has a valid ITF certificate or equivalent onboard.

## 16. SUITABILITY
The said cargoes, as described in this Charter Party/Contract, shall be stowed in suitable (clean, dry, rust, and order free), fully coated and/or stainless steel tanks on vessels with a double bottom. Tanks, pumps, pipelines, coils, valves and all other equipment shall, in all respects, be suitable for the safe carriage of the said cargoes.

## 17. LAST THREE CARGOES
Owners to advise last three (3) cargoes for Charterer's approval and intended stowage/tank size. Last three (3) cargoes to be clean unleaded with the immediate last cargo not on the FOSFA banned list. Charterer's have the right to refuse tanks which are considered to have unsuitable prior cargoes.

## 18. AMENDED CONOCO WEATHER CLAUSE
Delays in berthing for loading or discharging and any delays after berthing which are due to weather conditions (including fog) shall count as one half laytime or, if on demurrage, at one half demurrage rate.

## 19. NOTICE
The Owner shall provide the Charterer or their agent(s) and the loading/discharging terminal, as the case may be, in writing by fax or e-mail, 7 and 5 days provisional notice if applicable and 72/48/24 hours definite notice of arrival of the vessel at the load and discharge port(s). Any delay resulting from Owner's failure to give such notice shall not count as used laytime or time on demurrage.

## 20. NOTICE OF READINESS
The master or his agent shall give, in writing by fax or e-mail, 6 hours notice of readiness, to the loading or discharging terminal, as the case may be, in accordance with Clause 6, Part II of Asbatankvoy. No laytime or time on demurrage shall count prior to the expiration of the 6 hours unless used for loading or discharging cargo under this Charter Party/Contract.

## 21. LOAD/DISCHARGE PORT/BERTH RESTRICTIONS  - DELETE
~~Owner warrants that they are fully aware of the draft length, beam and other operational restrictions at the respective load/discharge ports and berths nominated under this Charter at the time of concluding the Charter Party/Contract. Any delay due to non-compliance with these port/berth restrictions shall be for Owner's account.~~

## 22. JOINT LAYTIME
When cargo is handled at a berth(s) for the account(s) of other Charterer in addition to Standard Commodities, the calculation of laytime or, if on demurrage, time on demurrage attributable to Standard Commodities shall be calculated as outlined below:

a.    All laytime or time on demurrage spent after tender notice of readiness until vessel commences its inward passage to the berth (the first berth if more than one is to be used at the berth) shall be allocated among all Charterer's loading or discharging at that berth in proportion to the quantities of their respective cargoes which are loaded or discharged at that berth.

b.    Time between all fast and hosed disconnected at each berth    During which cargoes are handled simultaneously shall be divided equally among all Charterer's whose cargo is being handled simultaneously;    During which cargoes are being handled separately shall be solely for the account of the Charterer whose cargo is being handled separately.

The above supersede any conflicting terms in this Charter Party/Contract.

## 23. VACATING LOAD BERTH
The vessel shall endeavour to vacate Charterer's berth within four (4) hours of completion of shipper's documentation.

3

24. BILL OF LADING AND CARGO RELEASE
In the event the original bills of lading are not present at the discharge port(s) upon vessel's arrival, and if the Charterer so requests, the owner agrees to discharge the cargo against the Charterer issuing letter of indemnification in accordance with Owner's P and I Club wording with no bank guarantee.

25. DEMURRAGE / CLAIM TIME BAR CLAUSE
Charterer's shall not be obliged to pay any claim (including demurrage), unless the claim, along with supporting documents (including, but not limited to vessel time sheets signed by ship's agent and terminal time log) is received by Charterer's within ninety (90) days from date of completion of discharge of cargo.

26. LAYTIME / DEMURRAGE EXEMPTION - DELETE
a. Time lost due to shore facilities being occupied during loading/discharging for other cargoes on the vessel shall not count as used laytime or time on demurrage.
b. Time shall not count as laytime or if the vessel is on demurrage as time on demurrage when spent or lost.
i) On an inward passage moving from anchorage or other waiting place, even if lightering has taken place at the anchorage, to the berth or other places of loading or discharging specified by Charterer, including awaiting tugs, pilot, tides, daylight, locks or any other reason whatsoever over which Charterer has no control.
ii) Due to breakdown, inefficiency or other causes attributable to the vessel and/or Owner.
iii) As a result of strike, lockout, stoppage or restraint of labour of master, officers or crew of the vessel or tugboat(s) or pilots(s).
iv) In handling ballast, bunkering not concurrent with loading and discharging, or for any other purpose of the vessel.
v) Due to vessel's condition or inability of the vessel's facilities to load or discharge cargo(es) as specified in this charter party.

27. P & I
The Owner warrants that throughout the term of this Charter Party/Contract, the vessel is entered in a reputable P&I club, which is a member of the "Inter Club Agreement".

28. POLLUTION INSURANCE
Owner warrants that they have in place the standard oil pollution coverage available from their P and I Club of One (1) Billion Dollars. Owner further warrants that such coverage will remain in effect from the date of this Charter Party.

29. RESPONSIBLE CARE
The Charterer and Owner acknowledge the importance of handling product in a manner that will ensure the safety of people and the protection of the environment. The Charterer and the Owner agree they will use, handle, store, transport and dispose of product in accordance with all applicable laws and regulations. The Owner warrants that it and the vessel's crew are familiar with handling and safety requirements; IMO, Marpol, and when applicable, U.S. Coast Guard classifications and requirements of the cargoes described in this Charter Party//Contract. The Owner further warrants that the vessel will follow cargo handling instructions issued by the Charterer, supplier, and/or the surveyor. Upon Owner's request, the Charterer will provide MSDS and any other relevant information about the cargo. The master, officer and crew are aware of the general properties and hazards of the cargo to be carried under this CP/COA, and the requirements for the safe handling thereof. And, they are trained in the use of the vessel's safety equipment, and they have been instructed on the nature of action which must be taken in emergencies involving the cargo. Owner shall comply with all laws, rules and regulations pertaining to the handling of hazardous materials.

30. EMERGENCY RESPONSE
The Owner warrants that it has in place a written "Vessel Emergency Response plan", which shall be put into use in the event of a spill or emergency or any other incident. Such plan shall, at a minimum, include the vessel's designated "Response Coordinator" and communication procedures between vessel, Owner, Charterer, shipper, receiver, authorities, etc.. The plan shall be available to the Charterer at all times, upon request.

4

31. CASUALTY/SPILL/INCIDENT NOTIFICATION CLAUSE

Serious maritime incidents during loading/discharging or the voyage related to grounding, collision, pollution, fire or explosion, or any marine incident with loss of life or serious injury and/or loss/damage of Charterer's cargo should be reported immediately by Owners to Standard Commodities on a most urgent basis by the fastest means possible.

Incidents should be reported to:

Standard Commodities

Emergency Tel No + 61 438 216488

The following must be reported:

i) The name of vessel and Charterer, cargo, type of casualty/incident
   i.e. fire/explosion, collision, grounding, chemical or oil spill etc.
ii) Geographic location of vessel and date/time in GMT of the incident.
iii) Extent of damage to vessel, shore facilities and personal injuries or deaths.
iv) Estimate of the cargo lost/damaged and identification of the products involved.
v) In the event of a spill, message is to include: type of cargo and/or bunkers spilled, cause if known, i.e. overflow, hose burst, hull rupture, shore or vessel line failure etc., estimated quantity spilled, status of clean up effort and other relevant comments.
vi) Telephone number of a contact within Owners organization with whom Charterer may communicate further.

If not all the above information is immediately available, initial notification should not be withheld. The balance of the information can be communicated directly to Charterer's or Charterer's representative when it becomes known. Nothing in the foregoing supersedes the Master/Owners obligation to make all notifications required by applicable governmental/civil authorities.

32. FORCE MAJEURE - DELETE

~~No liability shall result to Charterer for delays or non-performance caused by acts of God, acts of governments, war, strikes, civil commotions, fires, floods, other natural disasters or any other like or similar circumstances beyond the control of the Charterer, including breakdown of loading or unloading facilities or of plant facilities. The suffering party may at its option suspend or terminate performance of this Charter Party/Contract in whole or in part and no liabilities or damage shall be attached against either party on account thereof.~~

33. TAX

Section 12 : Taxes- Dues- Wharfage

(a) The Charterer shall pay all taxes, dues and other charges on the cargo.

(b) The Owner shall be solely responsible for any and all taxes imposed by any government or governmental authority with respect to the Vessel and any other property owned or leased by the Owner. The Charterer shall not pay or be responsible for any taxes imposed on the Owner by any government or governmental authority with respect to the vessel or any other property owned or leased by the Owner.

(c) The Owner shall be responsible for any and all taxes imposed on the Owner by any government or governmental authority with respect to the services provided in this Agreement.

(d) The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facilities arranged by the Charterer for the purposes of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

BIMCO ISPS (REVISED)

A. (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International     Ship Security Certificate) to the Charterer's. The Owners shall provide the Charterer's with the full style contact details of the Company Security Officer (CSO). For voyages to or from United States ports, Owners warrant that the Vessel shall comply with the requirements of the Maritime Transportation Safety Act and the Coast Guard regulations implementing this legislation ("MTSA").

(ii)    Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, shall be for Owners' account if caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code, MTSA, or this Clause; or if the delay results from measures imposed by the port facility or relevant authority which do not apply generally to vessels in that port but rather solely to the Owners' Vessel.

B.    (i)    The Charterer's shall provide the Owners with their full style contact details and, on request, with any other information the Owners need to obtain from Charterer's in order to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterer's to comply with this Clause shall be for the Charterer's' account and any delay caused by such failure shall count as laytime, or if on demurrage, as demurrage.

C.    Provided that the delay is not caused by the Charterer's failure to fulfil their obligations under sub-clause (B) above, nor by Owners' failure to comply with their obligations under the ISPS Code or MTSA, and that the measures causing delay are imposed by the port facility or relevant authority generally to vessels in that port and not solely to the Owner's Vessel, the following shall apply:

(i)    Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code or MTSA.

(ii) '   Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code or MTSA shall count as  half laytime or half time on demurrage if the Vessel is on laytime or demurrage; provided that if on the date of this Charter, Owners knew or it was publicly known that the port facility or relevant authority would impose such measures on the Vessel which would cause delay, due to her flag, ownership, age, crew nationalities, or classification society, the delay shall be excluded from laytime or demurrage.

D.    Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code or MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be shared equally between Owners and Charterer's, except that all such costs or expenses shall be for Owners' account if they result solely from the Owners' negligence or if, on the date of this Charter, Owners knew or it was publicly known that the port facility or relevant authority would require such additional costs or expenses to be incurred by the Vessel because of her flag, ownership, age, crew nationalities, or classification society. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

E.    If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

BIMCO AMS clause (revised)

(a)   If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Owners shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

    i)    Have in place a SCAC (Standard Carrier Alpha Code);

    ii)    Have in place an ICB (International Carrier Bond); and

    iii)    Submit a timely cargo declaration by AMS (Automated Manifest System) to the US Customs.

(b)  Charterer's shall provide

    i)    A precise description of the nature of the cargo (or the Harmonized Tariff Schedule number under which the cargo is classified);

    ii)    The shipper's name and address or identification number;

    iii)    The Consignee's name and address or identification number, or where goods are consigned to order, the "Notify Party" details;

    iv)    Internationally recognised hazardous material code when such materials are being shipped; and

    v)    on timely request by Owners, any other information the Owners and/or their agents need to obtain from Charterer's in order to enable Owners to submit a timely and accurate cargo declaration.    The Charterer's shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (excluding consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterer's' failure to comply with the provisions of this sub-clause.

Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall count as laytime or, if the Vessel is already on demurrage, time on demurrage.

(c)  The Owners assume liability for and shall indemnify, defend and hold harmless the Charterer's against any loss and/or damage whatsoever (excluding consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Owners' failure to comply with the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall not count as laytime or, if the Vessel is already on demurrage, time on demurrage.

(d)  The assumption of the role of carrier by the Owners pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

36.  Owners / their Agents / their Representatives warrant that they will not release the Original Bills of Lading or details or it's content to any party other than as the Charterers directs in writing.

7

Ibex Maritime Protective Clauses
Rev: 1.0 – Istanbul, 2007


Ibex Maritime

# IBEX MARITIME
## PROTECTIVE CLAUSES 2007

**1) FREIGHT TAX :**
In the event of any freight taxes (including but not limited to Port
Utilization tax, merchant marine renewal tax, consular and          revenue
tax) being assessed on the cargo, such cargoes shall be for charterers
account and shall be paid by the charterers without cost or risk to owners.

**2) MANDATORY PRE-WASH CLAUSE :**
(a) If before sailing from discharge port a mandatory prewash of cargo
tanks, in accordance with requirements as per MARPOL 73/78 Annex II, is
necessary, it is to be performed in direct continuation upon completion
of discharging cargo, in conformity with vessel's "Procedures and
Arrangements Manual" and in accordance with local port regulations.
Time used for such mandatory prewash shall be for charterers' account.

(b) On being notified by Owners, or their representatives, upon sailing
from load port or latest when discharging port(s) is (are) nominated,
Charterers shall provide suitable and adequate facilities which shall be
immediately available and accessible to the vessel upon completion of
discharge for the reception of such washing water/cargo residue mixture
originating from cargo carried under this Charter Party and respective
Bill(s) of Lading.

(c) The cost for the use of such facilities and responsibility for
ultimate disposal of the cargo residue mixture shall be for Charterers'
account.

(d) In the event that vessel is ordered to vacate the discharging berth
to perform the mandatory pre-wash, as provided under paragraph (a)
above, any shifting expenses and additional bunker costs to be for
Charterers' account.
Time used in shifting shall count as laytime or if vessel is on
demurrage, as time on demurrage.

Any delay in providing the necessary reception facilities and time used
for discharging cargo residues mixture shall count as laytime or, if
vessel is on demurrage, as time on demurrage.

(e) Any action or lack of action taken under this clause shall not
prejudice any other rights or obligations of the parties.

(f) The cargo's viscosity at 20 deg C shall be specified on a shipping
document, and if the cargo's viscosity exceeds 50 mPa-s at 20 deg C, the
temperature at which the cargo has a viscosity of 50 mPa-s shall be
specified in the shipping document

Ibex Maritime Protective Clauses
Rev: 1.0 – Istanbul, 2007

 Ibex Maritime

3) AMS CLAUSE:
(a) If loading cargo destined for the US, loading cargo from the US or
passing through US ports in transit, the Charterers shall:
(i) Latest 48 hours before ETA first US port for discharge or transit, or
if loading latest 48 hours before ETD from the US, provide all necessary
information to the Owners and/or their agents to enable them to submit a
timely and accurate cargo declaration directly to the US Customs; or
(ii) If permitted by US Customs Regulations (19 CFR 4.7) or any subsequent
amendments thereto, submit a cargo declaration directly to the US Customs
and provide the Owners with a copy thereof.
iii) Should there be any change in the destination, cargo description or
any other infomation initially submittet, the Charterers are promptly to
advise all changes, enabling filing of corrected manifest information.
Expenses for 2nd and subsequent corrections to the cargo declaration will
be filed at Charterers expense.
(b) The Charterers assume liability for and shall indemnify, defend and
hold harmless the Owners against any loss and/or damage whatsoever
(including consequential loss and/or damage) and any expenses, fines,
penalties and all other claims of whatsoever nature, including but not
limited to legal costs, arising from the Charterers' failure to comply with
the provisions of sub-clause (a), including any delay to the vessel
enforced by the US Customs due to late change of destination or other
manifest details.

(c) If the Vessel or any cargo is detained, attached, seized or arrested as
a result of the Charterers' failure to comply with the provisions of sub-
clause (a), the Charterers shall provide a bond or other security to ensure
the prompt release of the Vessel and/or cargo.

Ibex Maritime Protective Clauses
Rev: 1.0 – Istanbul, 2007

 **Ibex Maritime**

4) ICE CLAUSE:
The Vessel shall not be obliged to force ice but, subject to the
Owners'approval having due regard to its size, construction and class, may
follow ice-breakers.

(a) Port of Loading
(i) If at any time after setting out on the approach voyage the Vessel's
passage is impeded by ice, or if on arrival the loading port is
inaccessible by reason of ice, the Master or Owners shall notify the
Charterers thereof and request them to nominate a safe and accessible
alternative port.

If the Charterers fail within 48 running hours, Sundays and holidays
included, to make such nomination or agree to reckon laytime as if the
port named in the contract were accessible or declare that they cancel
the Charter Party, the Owners shall have the option of cancelling the
Charter Party. In the event of cancellation by either party, the
Charterers shall compensate the Owners for all proven loss of earnings
under this Charter Party.

(ii) If at any loading port the Master considers that there is a danger
of the Vessel being frozen in, and provided that the Master or Owners
immediately notify the Charterers thereof, the Vessel may leave with
cargo loaded on board and proceed to the nearest safe and ice free place
and there await the Charterers' nomination of a safe and accessible
alternative port within 24 running hours, Sundays and holidays excluded,
of the Master's or Owners' notification. If the Charterers fail to
nominate such alternative port, the vessel may proceed to any port(s),
whether or not on the customary route for the chartered voyage, to
complete with cargo for the Owners' account.

(b) Port of Discharge
(i) If the voyage to the discharging port is impeded by ice, or if on
arrival the discharging port is inaccessible by reason of ice, the
Master or Owners shall notify the Charterers thereof. In such case, the
Charterers shall have the option of keeping the Vessel waiting until the
port is accessible against paying compensation in an amount equivalent to
the rate of demurrage or of ordering the Vessel to a safe and
accessible alternative port.

If the Charterers fail to make such declaration within 48 running hours,
Sundays and holidays included, of the Master or Owners having given
notice to the Charterers, the Master may proceed without further notice
to the nearest safe and accessible port and there discharge the cargo.

*Ibax Maritime Protective Clauses*
*Rev: 1.0 – Istanbul, 2007*



Ibex Maritime

(ii) If at any discharging port the Master considers that there is a danger of the Vessel being frozen in, and provided that the Master or Owners immediately notify the Charterers thereof, the Vessel may leave with cargo remaining on board and proceed to the nearest safe and ice free place and there await the Charterers' nomination of a safe and accessible alternative port within 24 running hours, Sundays and holidays excluded, of the Master's or Owners' notification. If the Charterers fail to nominate such alternative port, the vessel may proceed to the nearest safe and accessible port and there discharge the remaining cargo.

(iii) On delivery of the cargo other than at the port(s) named in the contract, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if discharge had been at the original port(s) of destination, except that if the distance of the substituted port(s) exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port(s) shall be increased proportionately.

(iv) All costs for icer-breaker risk,expense to be for  charterers account and time countas used laytime for awaiting any ice-breaker.

5) NIGERIA / WEST AFRICA PORTS SPECIFIC CLAUSE:

Disbursement accounts in Nigerian ports or any west africa ports to be For charterer's account, and settled directly by them.

At discharge port(s), any undisputed demurrage to be settled by Charterers every three (3) days against owner's invoice, accompanied by Master's time sheets and b.b.b.

Any taxes and/or dues on cargo and/or freight including but not limited To Nigerian conservancy dues, ship dues, handling charges and nma levy To be for charterer's account and settled directly by them.

If any vetting arrangement is or should become necessary to call Nigeria, charterers to arrange for same at their time and expense. Should any delays be incurred same to be for charterer's account.

All time to count wpon in wafr all taxes and or dues on cargo and/or frt including but not limited to Nigerian conservancy dues, handling charges and levy to be for charterers account and settled directly by them . If a Nigerian certificate of compliance is required this to be arranged by charterers at their risk and expense and count as laytime or demurrage if on demurrage. Should any delays be incurred for arrangement same to be for charterers acct. Any time awaiting naval clearance to be for charterers account. Any delays in obtaining Nigerian task force permission to enter nigerian waters to count in full as used laytime or demurrage if on demurrage. Nma fee, if imposed, to be for charterers account and settled directly by them. Charterers to be responsible for any nma approvals.

Watchmen, if required, to be for charterer's account.

Any delays in Nigeria / west african ports in berthing, discharging or sailing due to strikes, bad weather, lockouts,restraints, work to rule, go slow and of other cause which owners/master/crew have no control on, to count as laytime or demurrage if on demurrage and expenses so incurred if any to be for charterers account.

**Ibex Maritime Protective Clauses**
Rev: 1.0 – Istanbul, 2007

 Ibex Maritime

Any and all taxes dues and taxes on cargo and or freight including but not
limited to  Nigerian conservancy dues, handling charges, NMA levy etc to be
for charterers account and to be settled directly by them.

In Nigeria, if vsl is delayed by strike actions, charterers to pay for all
time lost at demurrage rate pdpr for the duration of strike.

Master/owners/vessel shall have the option if necessary to avoid pirates to
steam off-shore pending berthing call in.





## HEATING AND HANDLING INSTRUCTIONS

TO THE MASTER OF THE CARRYING VESSEL,

Vessel: ................................................    Voyage No: .................................................

From: ................................................    To: ................................................

Commodity: ................................................    Quantity: ................................................

Date: ................................................    Stowage: ................................................

Please observe these instructions in order to reduce loss or damage claims. These instructions are in accordance with I.A.S.C. recommendations for handling, and Codex International Code of Practice for Storage and Transport of Oils and Fats in Bulk.

We request that two signed copies of these instructions be returned to the attending surveyor or handed to the ship's agent for return to our offices.

Vessel's tanks, lines and gauging equipment must not contain mercury, copper, or alloys of these materials as these metals may contribute to the damage of the oil. All mild steel tanks should be coated with a suitable material and be in a good condition. Any tanks with zinc in contact with the tallow should not be used for tallow above 2 % FFA on loading. Any tanks utilising heat exchangers on deck as the heating medium should not be used for tallow above 3 % FFA on loading.

Owners shall provide gauging equipment such as metal tapes; cup thermometers and, where available, remote temperature reporting equipment which is to be capable of 0.5 deg C precision and maintained in calibration. All calibration records are to be kept on board for inspection.

Temperature logs for each cargo tank are to be maintained throughout the voyage with copies made available to the consignee's surveyors.

### DURING THE VOYAGE

1. Ship's coils must be completely covered by the tallow on completion of loading, unless the heating is provided by a heat exchanger outside the tank.

2. Heating shall be effected by hot water or, if this is impractical, by low pressure steam. Any pressure up to 1.5 kilograms per square centimetre or 150 kPascal gauge reading is acceptable.

3.1 For tanks with heating coils - no heating shall be applied to the tallow during the voyage following the final load port until (4).

3.2 For tanks utilizing heat exchangers, the temperature shall be maintained at the minimum required for practical purposes to keep the product fluid, but not above 45ºC, until (4).

### ON DISCHARGING

4. In sufficient time prior to the arrival at port of discharge, at the very max 10 days out, heat should be applied gradually and evenly to ensure that the temperature of the tallow at time of discharge is not less than 54ºC and not more than 58ºC. The cargo

should be maintained within this range of temperatures throughout the discharge.   Receiver's surveyor is to be advised immediately of any deviation from these instructions prior to or during the discharge operation.

5.   The increase in temperature of the tallow during each period of 24 hours must never exceed 3ºC.   In order to avoid any damage to the quality of the tallow, it is essential that the heat should be applied gradually.   Any sudden increase in temperature of the tallow must be avoided as it will almost certainly result in damage.

6.   At no stage of the handling must the temperature of the tallow exceed 58ºC.

7.   Top and bottom temperatures should be maintained as equal as possible.  No large differences, say exceeding  5ºC,  in the temperature of the cargo in different parts of the tank should be permitted.

8.   The temperatures referred to above are the average of top, middle and bottom readings. The top reading should be taken at about 30 cms below the surface of the tallow.   The  bottom reading will be taken:

(a)  in tanks which have bottom coils, 30 cms above the level of the coils.

(b)  in tanks which have side coils but no floor coils, at a point about 60 cms from the bottom of the tank and about 30 cms from the side coils.

(c)  in tanks with no coils, utilizing heat exchangers, 30 cms above the tank bottom.

9.   The temperatures indicated are applicable under normal conditions ruling at port of discharge. In the event of abnormal conditions (such as extremely low air or water temperatures), receivers, either directly or through their appointed representatives, may vary the temperatures stated by giving to the ship owners or their agents, instructions to do so.    Details of any such variations must be duly recorded and advised to the shipper or his representatives.

10.  A signed chart showing daily temperatures for each tank should be provided to the receiver's surveyor at the port of discharge.

These instructions are to be clearly understood and fully complied with.

IMO

Under the IMO regulations, Tallow is category Y
Viscosity at 20 Deg C – SOLID
Temperature at which cargo has a viscosity of 50mPa/s – 45 Deg C
Melting point 42 Deg C

Signed by:-         ...............................................................
                        Name of Master (or stamp)

                        ----------------------------------------     ------------------------
                        Signature of Master                    Date

.................................................................     .............................
For and on behalf of STANDARD COMMODITIES PTY LTD.        Date

## ISPS Clause for Voyage Charter Parties

(a)  (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(d) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

# EXHIBIT B

Demurrage Calculation

| Ym Jupiter | | | C/P 03rd March 2009 | |
|---|---|---|---|---|
| | | | Laycan 20/23 March 2009 | |
| | | | Laytime 232:45 | |
| | | | Dem Rate 14000 | USD |

| Port | | Barcelona | | |
|---|---|---|---|---|
| Time starts | 19.03.2009 | 18.00 | | Nor Tendered |
| Time end | 22.03.2009 | 18.00 | 72:00 | Hose disconnected |
| Shifting from | 20.03.2009 | 19.15 | | Anchor Aweigh |
| Shifting to | 20.03.2009 | 21.25 | (0.02.10) | Gangway down |
| Not counting | | 0.06.00 | (0.06.00) | Nor Allowance |

| Time used | 2.15.50 hrs. |
|---|---|

| Port | | Genoa | | Remarks |
|---|---|---|---|---|
| Time starts | 24.03.2009 | 16:35 | | Gangway down |
| Time end | 27.03.2009 | 04:00 | 59:25 | Hose diconnected |
| Shifting from | | | | |
| Shifting to | | | (0.00.00) | |
| Not counting | | | (0.00.00) | |

| Not counting | | | (0.00.00) | |
|---|---|---|---|---|

| Time used | 2.11.25 hrs. |
|---|---|

| Port | | Port Harcourt | | |
|---|---|---|---|---|
| Time starts | 13.04.2009 | 07.40 | | Nor Tendered |
| Time end | 16.04.2009 | 21.10 | 85:30 | Hose disconnected |
| Shifting from | 14.04.2009 | 14.10 | | POB |
| Shifting to | 14.04.2009 | 19.00 | (0.04.50) | Allfast |
| Not counting | | 0.06.00 | (0.06.00) | Nor Allowance |

| | 3.02.40 hrs. |
|---|---|

| Port | | Lagos | | |
|---|---|---|---|---|
| Time starts | 19.04.2009 | 06.30 | | Nor Tendered |
| Time end | 15.05.2009 | 09.35 | 353:44 * | Commence Baseoil |
| Time starts | 16.05.2009 | 15.15 . | | Completed Basecoil |
| Time end | 30.05.2009 | 07.25 | 328:10 | Hose disconncetd |
| Shifting from | 28.05.2009 | 13.10 | | POB |
| Shifting to | 28.05.2009 | 15:05 | (0.01.55) | Berthed |
| Not counting | | 0.06.00 | (0.06.00) | Nor Allowance |

| Time used | 673:59 hrs. | |
|---|---|---|
| Total time used | 5.07.54 | day-hrs-min |
| | 797.24 | hrs. |
| Laytime allowed | 232:45 | |
| Demurrage | 639.15 | hrs. | 26.63 Days |
| Demurrage Amount | 372,840.05 | USD | |
| Less Payed amount | 266,000.00 | USD | |
| Balance Due | 106.840.05 | USD | 7.63 days  remaining |

| Remarks* | | |
|---|---|---|
| Total cargo to be discharged in Lagos | 6881.674 mts | |
| Standart comm. account | 3881.674 mts | |
| Demurrage on Standart comm acc | 56.41% | |

*At Lagos . Until the commencement of disch of Baseoils time counted as prorata i.e.15.05.09:35
*Upon completion of disch of the baseoils Time started to count in full for Tallow i.e 16.05 15:15